2004 ME 35

**Timothy LEVER**

v.

**ACADIA HOSPITAL CORPORATION et al.**

No. Pen–03–473.

Supreme Judicial Court of Maine.

Argued: Dec. 9, 2003.
Decided: March 15, 2004.

Steven D. Silin, Esq. (orally), Jeffrey Rosenblatt, Esq., Berman & Simmons, P.A., Lewiston, for plaintiff.

George C. Schelling, Esq. (orally), Renee L. Inman, Esq., Sandra L. Rothera, Esq., Gross, Minsky & Mogul, P.A., Bangor, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

ALEXANDER, J.

[¶ 1] Timothy Lever appeals from a summary judgment in favor of Acadia Hospital Corporation and three other defendants [1] entered in the Superior Court (Penobscot County, *Mead, J.*) determining that the defendants are immune from suit under the Maine Tort Claims Act, 14 M.R.S.A. §§ 8101–8118 (2003). Lever asserts that the trial court incorrectly found that the purpose of his evaluation by Aca-

1. The four defendants in this matter are Acadia Hospital Corporation, Acadia Healthcare, Inc., Eastern Maine Medical Center, and Eastern Maine Healthcare. For purposes of this opinion, the four defendants will be referred to collectively as "Acadia."

dia was to determine eligibility for involuntary commitment, a necessary prerequisite to generate immunity under the Maine Tort Claims Act. Lever also contends that the trial court improperly denied his motion to stay further proceedings in order to allow discovery before ruling on the motion for summary judgment. M.R. Civ. P. 56(f). Because we determine that disputes as to material fact remain as to the purpose of Lever's presence at Eastern Maine Medical Center on April 27, 2001, we vacate the summary judgment.

## I. STANDARD OF REVIEW

[¶ 2] We review the grant of a motion for summary judgment de novo. *Rogers v. Jackson*, 2002 ME 140, ¶ 5, 804 A.2d 379, 380. In our review, we consider the evidence and reasonable inferences that may be drawn from the evidence in the light most favorable to the party against whom the summary judgment has been granted in order to determine if the parties' statements of material facts and referenced record evidence reveal a genuine issue of material fact. *Id.* A genuine issue of material fact exists when there is sufficient evidence to require a fact-finder to choose between competing versions of the truth at trial. *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575.

[¶ 3] Consistent with our standard of review, the following statement of the facts of the case is presented, taking the facts before the court based on the parties' statements of material facts most favorably to Lever.

## II. CASE HISTORY

[¶ 4] Lever has a long history of mental illness. He had received in-patient treatment at Acadia for a week in March of 2001 and, upon discharge, had been scheduled to return to Acadia on April 27, 2001, for on-going outpatient observation and treatment. Several weeks after his discharge from in-patient treatment, and approximately one week before the incidents which gave rise to this case, Lever stopped taking his prescribed medications.

[¶ 5] On April 25, 2001, Lever, while delusional, broke into a home because he believed a light in the home was sending him a message. When arrested, Lever was aggressive and appeared to be hallucinatory. He remained in jail until April 27. At the jail, an Acadia employee spoke with Lever and spoke with Lever's caseworker and determined that it appeared that Lever had not been taking his medications. By April 27, Lever was viewed as "much calmer," though still disoriented. On this day, Lever appeared for a bail hearing and was released on his own recognizance, with a bail condition that upon release he "immediately seek admission and/or treatment at Acadia Hospital." The nature of the intended admission or treatment was not indicated in the bail order.

[¶ 6] Lever had a prescheduled appointment with his therapist at Acadia on April 27. However, upon his release, Lever was transported to Eastern Maine Medical Center for evaluation. Upon arrival at EMMC, Lever was initially examined by a nurse practitioner to "rule out any medical causes for his abnormal behavior." While Lever may have believed that the purpose of his trip to EMMC was to determine if he should be involuntarily hospitalized, it is unclear what information EMMC and Acadia personnel had regarding Lever and any intended purpose of his visit. The extent to which EMMC or Acadia employees were aware of Lever's bail condition is unclear.

[¶ 7] After being examined by the EMMC nurse practitioner, Lever was examined by a professional counselor employed by Acadia. This counselor was not a person authorized to order an involuntary commitment. The counselor indicated that she examined Lever for the pur-

poses of doing a psychiatric evaluation and making treatment recommendations. At the time, the counselor was aware that Lever had an on-going outpatient relationship with Acadia and that Lever had not been taking his prescribed medications.

[¶ 8] Apparently, no person with authority to order an involuntary commitment evaluated Lever on April 27. No involuntary commitment papers were prepared or presented for consideration on that date. The Acadia counselor concluded that Lever was not likely to cause harm to himself or others. The counselor discussed these conclusions with a psychiatrist who did not see Lever but who agreed, based on the information conveyed by the Acadia counselor, that Lever could be released. Lever was then released with the counselor's summary evaluation characterizing him as "low to no risk" but noting that "if off meds, uses poor judgment."

[¶ 9] When Lever was released, he walked from EMMC back to his apartment. He did not take his medications and continued to suffer delusions and hal-lucinations. The next day, Lever was shot by police while attempting an illegal entry at another residence.

[¶ 10] Approximately eleven months after Lever's release and the shooting incident, Lever filed a notice of claim against Acadia asserting professional medical negligence. The notice of claim was filed to start medical malpractice proceedings pursuant to 24 M.R.S.A. § 2853 (2000 & Supp. 2003). Acadia moved for summary judgment. Lever filed a response to Acadia's statement of material facts along with a supplemental statement of material facts pursuant to M.R. Civ. P. 56(h)(2).[2] Acadia filed a reply to Lever's statement of material facts asserting additional facts and providing exhibits. M.R. Civ. P. 56(h)(3).[3] Lever then filed a motion to strike Acadia's reply statement of material facts and exhibits. Additionally, Lever filed a motion pursuant to M.R. Civ. P. 56(f) to stay consideration of the motion for summary judgment, pending further discovery, particularly the deposition of the psychiatrist who had not seen Lever but who had been

---

2. M.R. Civ. P. 56(h)(2) was amended effective January 1, 2004. M.R. Civ. P. 56(h)(2) now reads as follows:

   (2) Opposing Statement of Material Facts. A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. Each such statement shall begin with the designation "Admitted," "Denied," or "Qualified" (and, in the case of an admission, shall end with such designation). The opposing statement may contain in separately titled section additional facts, each set forth in a separately numbered paragraph and supported by a record citation as required by paragraph (4) of this rule.

3. M.R. Civ. P. 56(h)(3) was amended effective January 1, 2004. M.R. Civ. P. 56(h)(3) now reads as follows:

   (3) Reply Statement of Material Facts. A party replying to the opposition to a motion for summary judgment shall submit with its reply a separate, short, and concise statement of material facts which shall be limited to any additional facts submitted by the opposing party. The reply statement shall admit, deny or qualify such additional facts by reference to the numbered paragraphs of the opposing party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by paragraph (4) of this rule. Each reply statement shall begin with the designation "Admitted," "Denied," or "Qualified" (and, in the case of an admission, shall end with such designation).

consulted prior to his release on April 27, 2001.

[¶ 11] The Superior Court granted Lever's motion to strike the additional material from Acadia's responding statement of material facts. The court then proceeded to consider the motion for summary judgment, implicitly denying Lever's M.R. Civ. P. 56(f) motion to stay. The court held that, pursuant to 34–B M.R.S.A. § 3861(1)(A) (Pamph.2003), Acadia and its agents were entitled to immunity under the Maine Tort Claims Act and granted Acadia's motion for summary judgment. Lever then brought this appeal.

## III. LEGAL ANALYSIS

■ [¶ 12] When medical personnel of private hospitals are evaluating individuals to determine if they should be involuntarily committed to a psychiatric hospital pursuant to state law, they are acting as state employees, entitled to discretionary function immunity pursuant to section 8111 of the Maine Tort Claims Act. 14 M.R.S.A. § 8111(1)(c) (2003); *Clark v. Maine Med. Ctr.*, 559 A.2d 358, 360 (Me.1989); *Taylor v. Herst*, 537 A.2d 1163, 1165 (Me.1988). In *Clark*, we noted that summary judgment was appropriate because the evaluation occurred at the private hospital "solely" because AMHI procedures made such an evaluation a prerequisite to involuntary commitment and "the only diagnosis and treatment sought was admission to AMHI." *Clark*, 559 A.2d at 360. At the time of *Clark* and *Taylor*, no statute specifically provided immunity to employees of private hospitals conducting evaluations for involuntary commitments. We based our immunity determination on the fact that the evaluating doctors were " 'acting in an official capacity on behalf of the State' " and " 'under the sole authority of

the statute.' " *Id.* (quoting *Taylor*, 537 A.2d at 1165).

[¶ 13] Shortly after the *Clark* and *Taylor* decisions, the law regarding involuntary commitments to private hospitals was clarified by P.L.1989, ch. 906.

[¶ 14] Regarding private hospitals—defined as "nonstate mental health institutions," 34–B M.R.S.A. § 3861(1)(A) (Pamph.2003) now provides that:

> The institution, any person contracting with the institution and any of its employees when admitting, treating or discharging a patient under the provisions of sections 3863 and 3864 under a contract with the department, for purposes of civil liability, must be deemed to be a governmental entity or an employee of a governmental entity under the Maine Tort Claims Act, Title 14, chapter 741.

[¶ 15] Lever contends that section 3861(1)(A) limits the protections of the Maine Tort Claims Act to hospitals under contract with the Department of Behavioral and Developmental Services, and that since Acadia has not demonstrated that it has such a contract, it is not entitled to Maine Tort Claims Act protection. A review of the legislative history[4] of 34–B M.R.S.A. § 3861(1)(A) indicates that it does not apply to the facts of this case.

[¶ 16] Section 3861 was substantially rewritten into its present form by P.L.1989, ch. 906, § 1 (effective July 14, 1990). The Statement of Facts to the original bill making this change, L.D. 1853 (114th Legis.1990), notes in part that the purpose of the legislation was "to facilitate the admission of involuntary patients to community hospitals with psychiatric units in order to relieve overcrowding at state mental health institutions." The Statement of

---

4. There were no House or Senate discussions of the legislation. The legislative history is based on a review of the Statements of Fact and Fiscal Notes in the original bill, L.D. 1853 (114th Legis.1990), and subsequent amendments.

Facts also noted that it was extending the protections of the Maine Tort Claims Act "to the hospital ... when the facility receives patients involuntarily committed under the provisions of Title 34–B."

[¶ 17] The "contract" language in the original bill was not discussed at all in the original Statement of Facts. L.D. 1853 (114th Legis.1990). The first reference to the "contract" language appears in a Fiscal Note to an amendment which substantially rewrote the language from the original draft bill. Comm. Amend. A. to L.D. 1853, No. H–986 (114th Legis.1990). It notes that the Department of Mental Health and Mental Retardation "will not contract with any facility that would incur costs beyond those able to be reimbursed within the department's resources." *Id.* The revised Statement of Facts with this amendment indicates that the amendment "applies specified provisions of the Maine Tort Claims Act to hospitals accepting involuntary commitments of mental patients under a contract with the Department of Mental Health and Mental Retardation." *Id.*

[¶ 18] This limited legislative history speaks exclusively of commitments, and expanding the ability of private hospitals to accept involuntarily committed patients. Section 3861(1)(A) itself references "admitting, treating or discharging a patient."

[¶ 19] Although the legislation was enacted only a year after *Clark* and two years after *Taylor,* nothing in the legislative history suggests that it anticipated any change or limitation of our precedent granting immunity to persons performing evaluations for possible involuntary commitments. It would be inconsistent with the legislative history, indicating a design to expand incentives for private hospitals to accept involuntarily committed patients, to construe it to somehow limit protections of the Maine Tort Claims Act that had previously been extended to such hospitals

doing involuntary commitment evaluations. In construing statutes, we look to the overall purpose of the law of which the section at issue forms a part and strive to interpret the language to avoid results that are inconsistent, unreasonable, or illogical in relation to the law's overall purpose. *Town of Eagle Lake v. Comm'r, Dep't of Educ.,* 2003 ME 37, ¶ 7, 818 A.2d 1034, 1037. Our interpretation here supports those objectives.

[¶ 20] Because adoption of section 3861(1)(A) did not change the law stated in *Clark* and *Taylor,* granting private hospitals Maine Tort Claims Act immunity for their evaluations of patients for involuntary commitment, the contract issue does not effect the law governing the evaluation in this case. However, the statement of the law in *Clark* and *Taylor* does not cover every evaluation of a patient with a mental condition at a private hospital. It is limited to evaluations for the purpose of involuntary commitment. *Clark,* 559 A.2d at 360.

[¶ 21] In this case, there is a dispute as to material fact as to the purpose for which Lever was transported to EMMC and evaluated by EMMC and Acadia personnel. During this time, he had an on-going outpatient relationship with Acadia. The bail condition directed Lever to "seek admission and/or treatment" with no further specification. While at EMMC, Lever was seen by no one with authority to order his involuntary commitment. No involuntary commitment papers were prepared or presented. While Lever may have believed he was being considered for involuntary commitment, the available evidence from the EMMC and Acadia personnel is unclear as to what they understood their purpose in performing an evaluation was. In the end, the evaluation that Lever was given prior to his release was consistent with the evaluation he had previously received from Acadia: to follow-up with his

on-going treatment program and take his medications.

[¶ 22] In these circumstances, the record, evaluated most favorably to Lever, leaves unresolved a dispute of material fact as to whether the sole or primary purpose of his evaluation and treatment by EMMC and Acadia on April 27 was to evaluate Lever for involuntary commitment. Because that dispute as to material fact remains, entry of summary judgment, presuming this issue resolved beyond dispute as to material fact, was error.

The entry is:

Judgment vacated. Remanded to the Superior Court for further proceedings consistent with this opinion.